In this appeal, Mr. Eastwood maintains, one, that he was subjected to custodial interrogation without being advised of his Miranda rights, and two, that his consent to search his home was involuntary because the consent was obtained after a lengthy and coercive detention and in violation of his Miranda rights. As a result of these constitutional violations, we maintain that not only his statements, but the physical evidence obtained as a result of the search must be suppressed. I'd like to first spend a few minutes talking about the facts that support a finding that Mr. Eastwood was in custody by police when he was asked, when he was interrogated and immediately asked for the consent to search his home. A reasonable person in his situation would not have felt free to leave. First of all – Before you get to that, let me just, before you get to those custody facts. Sure. When they stopped him, you then agree that there was certainly, there was a traffic stop on the one hand, but they also seemed to be conducting an investigatory stop as well. It was a staged stop. They're looking for this guy. They're following him as he moves around over the full day. This happens at 4 o'clock in the afternoon, at least that day, if not for 24 hours. Ostensibly for traffic, for expired plates. But they also seem to have, they also seem to have information that led them to the, they were looking for this. Absolutely. This stop – Investigatory stop as well. Yes. This stop – They wanted to talk to him. To question him about, as a burglary suspect in this burglary that they're investigating. Correct. So is it your position that when they stopped him, they had, do you treat this as just a traffic stop or do you treat it as reasonable suspicion, a Terry stop, a probable cause, or does that even make a difference? I'm not sure it actually makes a difference to his consent, because the consent is sort of a totality of the circumstances. What about his custody? I don't think it makes a difference to his custody, because he was stopped. They don't tell him immediately why he's being questioned. They know why he's being questioned. That can be relevant. I mean, why he's being held, sorry. And then they handcuff him. They place him in the back of a marked patrol car. And why do they handcuff him? The officer said, he looked like a flight risk to me. I decided to put handcuffs on him rather than chase him down the street. So at that point, I think the basis for the stop is not as important as the fact that he was in custody, because they were afraid he was going to walk away and they didn't want him to go away. There he waits in the back of that patrol car in handcuffs for 45 minutes until the investigating officers arrive. Now in the presence of four, not just two, officers, he was uncuffed, and he was immediately interrogated on his whereabouts over the past 24 hours while he stood next to a patrol car under close supervision. He was told that his name had come up in an investigation and that a witness was on his way to come by for a witness one-on-one identification. Now then, if not sooner, Mr. Eastwood knew that he was a criminal suspect. So the witness comes. He arrives in a patrol car, and he leaves in a patrol car. And after the witness left, Officer Kelly, who's one of the detectives, said, It's looking good for you. This guy says you're not the guy. Now at that point, that is an indication to Mr. Eastwood, you may be free to go soon, but not now, because it indicates that it's looking good for him. So maybe if I clear a few things up, you'll be able to go. But you're not free to go now. Eastwood had to ask for permission to smoke, further evidence of the fact that he was in custody. And when he did smoke, he sat down on a curb and was When you say he had to ask for permission to smoke, he did ask for permission to smoke, correct? Correct. But wasn't there any sign that says don't smoke unless we give you permission? There's never a sign in Nevada that says don't smoke, almost, because you can smoke everywhere. Going back just a bit, if there was probable cause to arrest him, then you say that doesn't make any difference, but it seems to me that makes all the difference. They could arrest him on the basis of probable cause, bring the person in and say, this isn't the guy, let him go, and then he would not Just once in custody, you're not always in custody, are you? Not necessarily. But I would maintain that here he's in custody during the time. I know you maintain that. Yes. But do the objective. We're not worried about what the police officers thought. No, right. And looking at it objectively, that's what we have to do here, right? Yeah. I mean, I think objectively, though, we're not looking at what the cops believe and not necessarily what Mr. Eastwood believed, but what a reasonable person in his situation, whether in that situation one would have been felt to leave, felt free to leave. I mean, if they let him go down the block or someplace and sit with his concierge or girlfriend or co-conspirator or what, then the problem is then generated in that frame of time, right? Well. Not when he had the handcuffs on, but when he may have indeed been in custody. Well, he's obviously in custody at the beginning. I maintain that the facts here with the interrogation, with being told that a witness is going to come by for a witness one-on-one, he knew that he was a criminal suspect. He was never told that he was free to leave. And, in fact, there were four officers standing by close supervision. When he – when they let him or when he asked to smoke, he sat on a curb and was flanked on either side by police officers. The Supreme Court has said that you do not have to tell somebody, oh, you're now free to leave to – that's a factor, of course. Correct. It's a factor. I mean, I've compared this case, particularly in the Miranda context, but I think obviously in the consent issue we have the totality. In the Miranda context, I've compared it to Kim, where the woman was not arrested. She arrived at the scene voluntarily. She was told that she was not under arrest. She – there was some evidence that she was told she was not free to leave. And yet the Court decided in that instance a reasonable person would have done exactly what she did, which is to feel compelled to stay there until the police stopped their questioning. And that's exactly what's going on here. He is a criminal suspect, and he is not – you know, a person in his situation is not going to be – feel free to leave. Plus, he's getting indications, like, it's looking good for you. It's looking good for you. This guy says you're not the one, which says soon, maybe, but not now. So we're – But what point should the police officers have given him his Miranda rights? They could have given him when they sat him in the car. They could have given it to him when they started interrogating him after they got him out of the car and uncuffed him. They immediately started interrogating him about his whereabouts over the past 24 hours. And in that particular situation, he was still separated from his girlfriend. He was close to the patrol car by the officers, meaning, you know, they're sort of enclosed around him. And they're interrogating him on – asking him questions that might incriminate him. And I think that in that situation, when you – you know, it's sort of a shock and awe. They put you in the back of the – handcuffed in the back of a patrol car. That subdues you. That initial show of force is critical, because it subdues you into sticking around. You're not just going to walk away. Which – what questions were incriminatory? Well, there were several. One is that they asked – they start peppering him, separated from his girlfriend, about his whereabouts over the past 24 hours to see if they can put together a map of where he's been, how it matches her, what she's saying. So that was interrogation. And then the real punch comes after he's been there for two hours at least, around 6 p.m. He was stopped at 4. When they ask him, is there anything of interest in your apartment, we know that you have some personal use amounts of methamphetamine. We're not interested in that. Do you have any guns in your apartment? Now, that is interrogation. And this is after he's been there for a long time, two hours, subjected to a witness ID, handcuffed for nearly half of that time in the back of a patrol car. No one in that situation, a reasonable person, would not have felt free to leave, and that is interrogation. And I guess what so contaminates this consent – so even if you were to find technically for some reason, and that's not my position, but assuming for some reason you don't think that there's a Miranda violation here, this span of detention, the fact that he's a criminal suspect, that they're asking him these questions, that he was – that initial show of force. They ask him the interrogating question about the guns. He initially denies, and they immediately zap him with the request for consent. Now, that is not just an interrogation tactic. That is also a psychological coercion tactic, because he says – he denies. They give him the time. They give him – sorry, I'm distracted by the time. They say, will you give us a consent? Well, if you're innocent, you give consent, because you're innocent. Then he's got this hanging over his head, so the next statement he makes is that, you know, I – you know, isn't this all about that robbery? The guns are in my apartment. So if I could, I'd still like to reserve one minute. Well, so eventually he agrees to take him to the apartment, and they ask him for consent to search. Yes. And he signs the consent form. He does. There's – the government will argue that there's three consents. The first two are verbal. One right after the gun statement. The second one right after he makes the really incriminating statement about the guns are in the apartment. Those are both verbal. At none – during none of those was he actually informed of his right to refuse consent, which is an important factor. That only comes later when he's – when it's on the consent form. By that time, it's sort of too late. I mean, the cat's already out of the bag. He's already at the apartment sitting in a van, poised to go into the apartment and show the police what he's got in there. And then they – it sort of happens to be in there that he can refuse. The only other earlier indication that he could refuse was a hand gesture, not words, not in writing, that he could refuse. I think that – I'll stop now if I could reserve my time for rebuttal for one minute, if I could, unless you have further questions. I thought this was rebuttal. Okay. Go ahead. Have a seat. Okay. Good afternoon. May it please the Court. My name is Justin Roberts. I'm an assistant United States attorney in the District of Nevada. I'd like to just start by quoting this Court in two recent opinions related to this issue. One is the Butler opinion from 2001, in which this Court noted that the casebooks are full of scenarios in which a person is detained by law enforcement officers but is not in custody for Miranda purposes. I would submit that that is the case here again today. Also in the Kim opinion, there's another quote. It's actually a quote of a Supreme Court opinion, but the Kim opinion from 2002 from this Court, in which this Court said, quote, a situation is not coercive simply by virtue of the fact that the police officer is part of the law enforcement system, which may ultimately cause the suspect to be charged with a crime. Now ---- You sort of tripped over some words I missed. Want to read that again? Sure. A situation is not coercive simply by virtue of the fact that the police officer is part of the law enforcement system, which may ultimately cause the suspect to be charged with a crime. That's the Kim opinion, Your Honor. But the appellant's counsel indicated that ---- And in Kim, the Court suppressed it. Yes. The statement should have been suppressed. Yes, it did, Your Honor. That was a government appeal in Kim. The facts of the Kim case are quite different from the facts before the Court. The first case was the person in handcuffs in the backseat of a car. The Butler case was an immigration stop or a stop at an immigration point coming in from Mexico. The person ---- the Court analyzed the custody analysis through various stages of the proceeding because of he was ultimately put into a holding cell and then interrogated. Here, there was no interrogation. That was a border search, right? That's correct. Boy, there's a big difference between border searches. There's also a big difference between being interrogated while you're in cuffs and being asked a question while you're not in cuffs and spontaneously giving an admission that's not in response to interrogation, which, again, I submit is the case with the ---- I'm still interested in the first question I asked counsel, which was, does it make any difference whether there was PC, probable cause to stop, or reasonable suspicion in any of the analysis here in Judge Beam's question? Well, Your Honor, I ---- under the totality of the circumstances with respect to the consent to search, I don't think it makes a difference. With respect to the ---- one of the five factors in the consent to search is whether or not he was Mirandized, and now we have from the Kim opinion citing previous opinions of this Court, there's also a five-factor test to tell whether or not someone is in custody for Miranda purposes. So it makes a difference with respect to the Miranda analysis. I don't think it makes a difference with respect to the voluntariness of the consent to search department. None of those lists are exclusive. That's correct. All right. That's correct. And it cuts ---- oftentimes it cuts in both ways. But I'd like to point out that appellant counsel has indicated that the defendant was not told that he was free to leave. In fact, no questions were asked of the defendant that we ---- that are in the record. No questions were asked of the defendant while he was in cuffs in the patrol car from a period. The record suggests it was sometime between 45 ---- 15 to 45 minutes. I believe the magistrate court judge found that it was closer to 40 to 45 minutes. There are no questions asked during that time period. Immediately upon arrival of the scene, he is taken out of cuffs and told he's not told you're not free to leave, but he is told you're not under arrest. He's told he's asked permission to ask him some questions. Your name is ---- or we're investigating something in which your name has come up. Can we ask you some questions? He is asked whether or not he would consent to search of the apartment, and he is told that he does not have to consent to search. He was sitting in the back of the police car. How was he handcuffed, in the front or the back? I don't believe there's any indication in the record as to how he's handcuffed. Nothing at that issue here in terms of the statements he made relate to what he said anything he might have said in the patrol car. Well, the question is whether he was in custody. Most times they handcuff them when their hands are in the back, right? I'm sorry? Most of the time when they're handcuffed, their hands are in the back. I assume that's correct. Your Honor, yes. So you think he felt like he was free to leave? He was told that you're not under arrest. He was removed from the ---- You know, you're sitting in a police car, and you've got your handcuffs on, and they're behind your back, and the ---- but, you know, you're not under arrest, see? So, I mean, you think he felt like he could just say, hey, I want to go home, take these cuffs off? The cuffs were not. The cuffs were not on during any of the discussion. Yes, but there was no interrogation. There was no interrogation for Miranda purposes during the time that he was in the car. As I understand the defendant's argument here is that this ---- during this two-hour period, he was in custody. And you look at a number of factors. One of the ones ---- you know, if you read the cases in this area, when you handcuff somebody, that's one of the ---- that's a big sign that somebody's in custody. That's correct. Not determined, but it's pretty, you know, it's a pretty good sign. That is correct. And you're in a back ---- and put them in the back seat of a patrol car, and you keep them there for 45 minutes, you know, that's ---- But the custody analysis is coupled, Your Honor, if I may respectfully suggest, the custody analysis is coupled with the interrogation analysis, which is another part of the Miranda analysis, whether any statements were made during the period of time in which he was in custody. So from the point of view ---- The point of view of the judge is that he was told that he was released, that he was ---- he should have felt free to leave. He was told he was not under arrest. He was asked if he would be willing to stay around for someone to see him. He was asked if he would be willing to do so. He was asked if he would be willing to answer some questions. He was told he was not under arrest. He was allowed to talk to his girlfriend. In the Kim case, the officers kept the son and Mrs. Kim separated from each other. At what point did they tell him? That somebody ---- we're bringing somebody over here to see if they can ID you. I believe it was ---- there's no time analysis, minute by minute, in the record. But it was he is taken out of the car, he's uncuffed. When he's uncuffed, he's then told you're not under arrest, and then he's asked permission, and then the analysis proceeds from there. Nothing happens by way of interrogation during a time in which he's in cuffs. And I understand the cases that Your Honor is speaking of in counsel for the defendant. No, I mean, when he was in the car, was the door closed? Back door closed? There's nothing in the record indicating whether it was or was not open or closed. You'd have to assume it was closed, wouldn't you? I respectfully suggest that that still does not go to the analysis of the voluntariness of the consent. Let's forget about that. So let's say he's in the back seat of the car. He's handcuffed. The hands are behind his back, and the doors are closed. And would you say he was under arrest? Just that one question. Forget about everything else. Is he under arrest? Not necessarily, Your Honor. Oh, yeah? You heard that earlier. I thought the answer was it depends. Isn't that what they teach in law school? Well, it depends not necessarily. It depends on what? That's the issue. Well, the issue is whether or not incriminating statements were made during a time period in which this man was in custody. Forget about Miranda. You know, let's forget about Miranda. Stop someone, put them in the back seat of the car, you handcuff them. It's a traffic stop, Your Honor. He had been stopped for having unregistered or expired license plates. It was a traffic stop in which they were doing a records check. In the meantime, I believe it is allowable to hold him for a traffic stop. Handcuff somebody when they're doing a records check on a simple traffic stop in Nevada? I mean, they just run those. What were they checking out? Well, Your Honor, if I may respectfully ask. License expired. I want to know if there was a false arrest at that time. Let's say they decided to bring a license plate. There was no false arrest. There was an expired license plate. He was stopped lawfully for the expired license plate. The fact that it may have been pretextual doesn't otherwise make the remainder of the contact with law enforcement. You know, you don't throw the whole thing out as a result of that. It may not have been the finest hour for the police department, but I'm as we go through the analysis that this Court is. I haven't seen too many fine hours here. I understand that. I understand that. I mean, what fine hour have you seen here this morning? You sat through all of this. Tell me, what is the fine hour you've heard here in these three or four cases? Well, Your Honor, as I think my colleague indicated previously, if we could be present at each one of these circumstances, we might advise differently. But that's not how these cases come to us, nor is it the way they come to this Court. But, I mean, okay. So the answer is you can't tell me about the finest hour. Well, my answer, Your Honor, is that the consent here to search was voluntary. The statements made were made not in response to interrogation, and the defendant was not in custody during the time of his interaction with Officer Kelly. In fact, one of the officers testified that he was, if he had started to walk away, she would let him go away. Let me ask you. So from your perspective, you would like us to evaluate whether or not he should have been given his Miranda rights at the moment he's taken out of the car and released from the handcuffs? No. I'm not saying that it's from the moment. I'm just saying that the statements made at issue, Miranda is designed to safeguard an interrogation in which a defendant is in custody at the time he's being interrogated. What you're saying is that at the time – I don't quite understand what you're saying. Well, because – Are you saying – I think what I understood you to say was that when he's taken out of the car, if he had been in custody, he was clearly not in custody at that point when they released him off – when they released the handcuffs and he was free to leave. That is – that's correct. That's what you're saying. So on the one hand, you're saying that during the time that he was in the car, he was in custody. I'm not saying that, Your Honor. I'm saying he may have been in custody. It's a factor that cuts towards whether or not he was in custody and felt free to leave under the five factors that I've given you. So then your argument is, is that he was not in custody when he was in handcuffs in the back – in the car for 45 minutes. He was not in custody. But if he was – but if we think he was in custody when he got out – when he was taken out of the car, released from his handcuffs, he should have realized that he was free to leave. That's – that's correct, Your Honor. That's how a lot of arguments come before the Court, that as an alternative argument, that at the time he's allowed out of the – of the automobile, it's a noncustodial discussion, and it's not an interrogation. His statements are made spontaneously. Rhode Island v. Innis, the defendant was in custody. He was in the back of a patrol car, and then he made spontaneous admissions. Here, Mr. Eastwood made them as he had just been told. It looks like things are looking good for you. And he was not – his statements were not in response to any interrogation. And that's the Rhode Island v. Innis analysis. So my – my point in – in slicing it thinly as to whether or not his – the statements at issue before the Court were made while he was in custody is that, first of all, those statements were made not while he was in – when he was not in custody, and secondly, that they were not made in response to any interrogation. But then, am I wrong? So they – he gets out, and they take the handcuffs off, and he's not in custody. And he's told you you're not under arrest. He's not under arrest. And, you know, you can go. He's asked permission. And – and then – and then they – this witness comes, and they say, well, it's starting to look good for you. And so he's feeling a little better. And – And he's given an opportunity to check his story with his girlfriend before he voluntarily makes the statement that he needs. Then he comes back. Unlike the Kim case. And then he comes back, and then he's asked if he's got any guns in his apartment. Right? Is that right? Is that what happened? He's asked whether there's anything of interest in his apartment. Anything of interest in the apartment. Okay. He is asked, and he says no. And then he gives a hypothetical about something maniac. We know you're using whatever it is, but we don't care much about that. So then they – then he knows that they're not interested in – in the drugs. And then he tells them about the guns, huh? Well, they asked him if he had any guns. Didn't they? And he said no. And then they said, can I have your consent? And you may refuse to consent. Counsel, don't the cases make a distinction between the detention when you're not free to go in, say, a Terry situation, when there's a legitimate traffic stop, and a non-custodial situation at all when you're free to go? When if a police officer makes a Terry stop on the street. United States v. Butler. This Court held reasonable, articulable suspicion. He's free to stop somebody and make a Terry investigation, during which time he's not free to go. Being not free to go isn't a touchstone, is it? Well, that's – that gets back to a point that I was trying to make previously that may not have been very articulate in the exchange. But further on in the Butler opinion, this Court does note that a Terry stop and frisk and a discussion is not custody for Miranda purposes. When you stop somebody along Interstate 80, for instance, out where I live, for a traffic – ostensibly for a traffic stop, and they're really looking for drugs. During the time that they put you in the patrol car and check the computer to see whether you're wanted or anything like that, you're not free to go, but ordinarily they don't put the – the only difference in that situation in here is that they put Is that right? I believe that that is correct, Your Honor. Then when you're done with the traffic stop, then you say, well, you're free to go. But as they walk back to the police car, but by the way, may I ask you about drugs and all that sort of thing? That's the crucial time. But – and that is the crucial time. That's what I was hopefully articulating to the Court. But the – all of the statements that are at issue were all made after this man is let out of his costume, let out of the car, and told that he's not under arrest, asked permission for various things along the way, given access to his girlfriend, all of these things distinguishing this situation from the Kim situation. And then you have the most damning statement that he makes is actually made not in response to interrogation. First of all, he's not in custody. Secondly, it's not in response to interrogation. So he's not in custody for Miranda purposes, and it's not interrogation for Rhode Island v. Innis purposes. So how about when he was in the vehicle, handcuffed, for whatever it was, 40 minutes? Was that a Terry stop? Is that what you're saying? Your Honor, it could be conceived as a Terry stop. I mean, he had violated the law. I guess the problem, I don't understand what the government's position is with respect to the – what happened to the stop. Is it a Terry stop or is it a traffic stop or is it a probable cause? I think it makes a difference, but – It's not an issue that's actually been raised in any of the papers as to what kind of stop it was. It's part of the – I understand, but it's not part of the – even as part of the analysis on the totality of the circumstances, as I've indicated ad nauseum, that whether or not it was an arrest and he's unarrested, whether or not it's a Terry stop to which the Miranda custody analysis does not apply. We just ask you as an expert in criminal law. I don't hold myself out to be as an expert in criminal law. You look like one. Is that a Terry stop? I mean, when they put him in the back and he's handcuffed, is that a Terry stop? What's the nature of the detention when you just do a traffic stop, for instance, along the road and put somebody in the car? It's for officer safety and it's to run the checks. It's a Terry stop, but it's not based on reasonable suspicion. It's actually based upon the violation of a – It's based on the probable cause for the violation, the traffic violation, and he's then placed into custody for that. He's told that it's because of expired plates. But here you didn't have any probable cause. You put him in a police car without probable cause. Well, the probable cause as to – there was probable cause as to the traffic violation. But they weren't arresting him for the traffic violation. I mean, there are cases that talk – as Judge Beam was saying, there are cases that talk about if you exceed the scope of the Terry stop, then what happens after that is no good. So – None of those cases were presented below this issue. This issue was not raised below – On one hand, you don't want to argue that it was a Terry stop. On the other hand – Quite frankly, Your Honor, I wasn't prepared to argue that because it was not – it was brought up by defendant below. It was not what the report – But the issue – but the heart of the question here that they've raised, and one of the questions they've raised is, was he in custody? That's correct. It is the heart of the question. It's one of the five factors in terms of the voluntariness and the consent, and then it's – I would submit that he's not in custody under the Kim five-factor analysis. And because of the statements and everything that we're talking about here that are made, are made after he's told that he's free to go. Well, you know, we can just obviate all this. If they take that 10-cent card and they stop someone and they put them in the back and they say, let me – you know, I'm a good guy. I'm going to tell you about your – I'm going to give you a course in civics, and I'm going to tell you about your constitutional rights. He is – he is, in fact, told that he doesn't have to consent to certainty of pardon. We save a lot of time. You know what happened? All those cards I passed out to police officers in the San Fernando Valley, even as recently as a few years ago, they'll stop me and they'll show me the card and they'll say, see this card? Yeah. You gave it to me.  It's helped me solve a lot of crimes. As they go up, one fellow told me he knocked on a door. One officer knocked on the door. He was investigating a big art theft. Knocked on the door. Woman answered, and he said that, you know, he was investigating an art theft, and could he come in the house. She said, do you have a warrant? And he said, no. And she said, well, he can't come in. He said, well, before I leave, let me read this to you. He read her Miranda rights. And as soon as he got through, she looked at him and said, come on in. Showed all the stuff. She figured he was a nice guy. He was worried about her Fourth and Fifth Amendment rights. Before you sit down, would you do me a favor? I agree with Judge Pregston. We all wouldn't be here with all this, you know, just giving the rights. It's not a big deal. I wouldn't be here, Your Honor. I noticed in the transcript of this proceeding, the officers kept saying that they weren't required to give Miranda rights. They were sensitive to the fact that they kept repeating, oh, we didn't have to give Miranda rights here because he wasn't in custody. And this wasn't a – there was no interrogation. And this wasn't in – they knew and, you know, they were sensitive. It was almost like they were trying to see how much information they could get without giving any Miranda warnings. But be that as it may, what I'm interested in – That's their job. Well, I understand. But their job is also to give Miranda warnings when they're required to. But what I'm interested in is what factors do you point to with respect to the consent form that when he signed the consent form that it was voluntary? The fact that one of the very first lines in the consent form is that having been advised of my right to not consent to the search of this apartment, I do consent to it. It's one of the first lines, if not the very – you know, I, state your name, having been advised that I don't have to give up this consent. That's one of the factors as to the consent of the search. But, yes, that is on that form. He was also told verbally and by hand gesture that you don't have to give the consent. But I read the transcript. I tried to figure out what the hand gesture was, but I wasn't quite sure. It's sort of like this. My understanding was that from what I read, it appeared to be something like would you give it to us in writing and you don't have to. But I honestly don't know. I wasn't counsel below. If I was counsel below, I wouldn't have signed it. And Mr. Eastwood was supposed to understand that to mean that he didn't have to give a consent? I think that's correct. I believe that he was supposed to understand that. We don't hear from Mr. Eastwood incidentally. If you did that to me, I don't know that I would understand that to mean. Incidentally, Your Honor, we don't hear from Mr. Eastwood. He could have given his version of events at the suppression hearing. He chose not to. A lot of the cases that are recent cases, including Kim, the defendant did give us their version of events. So it is a preponderance of the evidence standard. You can't hold that against him, though. You can't hold it against him. But the evidence that's in the record is that the officer said he indicated that he didn't have to give consent. That's correct. You can't hold it against him, nor can you hold it against the government, because the government put its evidence forward that he was told that he didn't have to consent to the search. If there are no further questions. Okay. Thanks. I will try to be brief. Just picking up on that last point, the government actually conceded in its answering brief before this Court that he was told initially by gesture that he had the right to refuse consent, and then only later told in writing, you know, when he's at the when he actually is signing the consent form. So that testimony is very unclear from the evidentiary hearing. It appears that it was only a gesture, and that seems to be what the government was representing before we appeared today. Just a few details. The Court, because I think this, you know, there's the Miranda issue. The government doesn't care about the Miranda issue if they can still get the stuff in the apartment. And that's one reason why, you know, sort of putting the Tenth Circuit's approach and Patain aside, I think it's so essential to view this five-hour detention as one, sort of one big thing. And two and a half hours into that is when he's asked about guns. At three hours, he's signing the consent form. After he's already been questioned, admitted that he has guns in his apartment and then asked, you know, sort of this little dance about will you let us go search. So by the time he gets to that written consent form, I mean, it's too far down the line. They've already got him exactly where he wants, where they want him to be. And with respect to the Miranda violation, it's really critical, I think, that this that the tag, that sort of tag approach with the interrogation and then the consent along with all of the other factors, I mean, in the totality of this, they go together. So it's not just the statement, I have guns in my apartment, but it's actually the whole, this whole situation, the show of force, the length of time, the fact that he was targeted as a criminal suspect, subjected to an I.D. procedure. They never told him he was free to go. They knew how to do that. They told him sometime after 9 o'clock that he was free to go. The arrest, the investigating officer said in her, she hesitated when asked was he free to go after you told him that he was not under arrest. She hesitated and said that although she wouldn't have run after him, she says, because there was traffic, they still would have tried to speak with him. She said that twice. So even in her testimony, which is her subjective view and not dispositive in any respect, it was not clear to her that he was free to go. I think to any reasonable person in this situation, they would have felt that they were not free to go, that they were in custody, but more importantly, that Miranda analysis feeds into the whole picture where the initial show of force comes in is definitely a factor, and it doesn't matter if there's interruptions, because it's that whole experience from start to finish on a, this staged traffic stop where they knew before they stopped him that that is all one big package, and I think the voluntary consent is not what you get at the end of that experience. So thank you very much for your patience. Thank you. The matter is submitted, and we come now to Liberty Energy.
judges: Pregerson, Beam Paez